Good morning, Your Honors. My name is Doran Weinberg, and I am a counsel for Appellants Rusty McDowell and McDowell & Co. Unless the Court has a different preference, I intended to address three interrelated issues and also intend to save a few moments of my time for rebuttal. Your Honors, I believe that the fundamental problems in this case begin with the indictment itself. The indictment is couched under 1341 and 1343, but it is plainly defective for failing to state the offense of mail or wire fraud for the simple reason that it fails to state that any false pretense or false representation of any kind was made. What the indictment alleges is that defendants, appellants, diverted confidential information. They obtained it and misused it. Now, that allegation may or may not constitute the state law crime of conversion, may or may not state a civil tort, but it doesn't state a federal offense of wire fraud. Wire fraud requires allegation and proof of a material false or fraudulent pretense. Now, the government responds that Wood's decision of this circuit is proof that that is not a requirement, that one can be charged and convicted of wire fraud and mail fraud without evidence of a specific false statement. That's absolutely true, but it misses the point. You can commit a fraud without a specific false statement, but you can't do it without a false pretense. You can create circumstances that mislead, even though you haven't specifically lied, but you have to affirmatively create a false pretense. Wood's does not overrule Nieder. It couldn't. And the United States Supreme Court in Nieder plainly required materiality of a false pretense or statement. And the fact that Wood's doesn't overrule Nieder, which is a proposition that this Court hardly needs proof for, is in fact established by the subsequent decision of the circuit in United States v. Omer, which we cite in our reply brief. There is a requirement plain that an indictment allege under 1341 and 1343 a material false pretense. None was alleged. This indictment does not set forth a federal crime. It may or may not suggest a state crime, but it plainly does not allege a federal crime. Now, defendants objected to this vigorously. I mean, there were motions to dismiss the indictment because of its unclarity. There were requests for a bill of particulars asking what is it exactly that we did wrong? What are the false pretenses? And although it is true that the defendants did not specifically say the indictment must be dismissed because no material false pretense is alleged, the fact is that the bill of particulars made that specific request, what is the false pretense, and defendants repeatedly objected to the lack of clarity and lack of notice in the indictment. And the Court denied the lesser request for a bill of particulars. So it's clear that any request for dismissal would have been fruitless because the lesser request for a bill of particulars was denied by the Court. Judge Schroeder, did you have a question? I'm just wondering what was, by this omission, that the indictment was not as precise and expressed as to the elements as it should have been, just what it was that you were unable to prepare for, that you got caught? Would that it were a mere lack of precision, Your Honor? Well, yes. That's what the question is. Exactly. And let me take that one, because I don't know if that's what you're trying to say. Is it that what we're talking about is a failure to allege something expressly or is that didn't harm you, or whether there was really something here that you got sandbagged by? Let me say first that the failure of the indictment to state an offense is reachable by this Court and should be reached by this Court, even if it were not prejudicial. But there is no question that this failure of the indictment was prejudicial. And what it did was, precisely because the indictment didn't articulate a federal crime, the defendants spent the next two years plus trying to figure out exactly what it was they were charged with. And what developed was that the prosecution, rather than looking at the indictment as a roadmap, looked at it as a Rorschach test. Every time the government was questioned about what was in the indictment, the So first, if the Court recalls, and I'm sure the Court does, the indictment alleges that information was obtained, confidential information was obtained and misappropriated. The dates of the indictment are between 1994 and 2000, but the only specific allegation of obtaining information is the allegation that information was obtained from Martin Lean. Mr. Lean stopped working for the company Applied Materials, as the indictment recognizes, in 1993. So we have an indictment that says confidential information was obtained in 1993 from Martin Lean, and then the indictment says fraud was committed between 1994 and 2000. Okay? At first, the Court and the government appeared to be perfectly content, despite the objections of the defendants, to proceed on the theory that this was essentially a theft. And the Court, in colloquies, and I can point to pages 134, 158, 160, and 163 of our excerpt, the Court and the government repeatedly articulated the offense as, well, this was theft in essence, right? They stole it in essence, right? So they were being told, you're charged with theft. It's not a Federal crime, but that's what they were told. Now then, the indictment says the theft occurred in the context of Martin Lean. After the defendants had raised the issue of what false pretense are we charged with, the government finally apparently realized that a false pretense was required. So the government now took the position that, yes, it had in fact alleged a false pretense. With respect to Martin Lean, but the problem with that is that was outside the indictment period and presumably outside the statute of limitations period. So what the government said is, yes, we've alleged a false pretense, and Martin Lean was not the false pretense. Martin Lean was merely background, background to other allegations. That appears on page 265 of the excerpt. And what the government says is, we're looking at a whole universe of misrepresentations to various people, various employees of Applied, none of which appears in the indictment. And all of a sudden Martin Lean, which is the only allegation in the indictment, becomes background. It's no longer what the indictment charges. Defendants are still concerned. And defendants are now completely confused by what's going on. And repeatedly there are motions and court hearings. And even at this point, and this is at page 270 of our excerpt, that even at this point the government is arguing to the court that its indictment means that even if the defendants got the drawings legitimately, did not make a misrepresentation to get the drawings, but later changed the stamps, the manufacturer's identification stamps on the drawings, that the jury could find that the change of the drawings, the covering up of the identification, that could be the false statement. So the government has the indictment that says you can find whatever you want here, Judge. The jury can find whatever it wants. But the defendants are not charged with any of this. So, again, the defendants complain about shifting theories. Counsel, it does charge a scheme. Does it not? Yes. A scheme does not necessarily require one false statement. Is that correct? That is correct. All right. Thank you. Well, a scheme does not require one false statement, but a scheme requires at least one false pretense. And the indictment has to identify what that false pretense is. Some misleading material misrepresentation or omission has to occur, or else there is no federal crime. Otherwise, it's theft. If you just take something from somebody. But does the indictment have to spell out the evidence? Yes, Your Honor, an indictment has to spell out the evidence. It has to spell out the evidence? Well, not the last time I looked. The indictment does not give note. This indictment does not give notice of what the defendants are charged with. The defendants do everything they can. They move to dismiss. They move for bill particulars. What is it we're charged with? And they are told every time they ask something different. And there's be different names used. But is there any doubt here that what was happening was you were getting these drawings and using them, your client, through the mail, and using them to make the stuff from the drawings and selling them? Absolutely, Your Honor. There is a question about that? There is doubt about that, Your Honor. There is doubt. And that's not supported beyond a reasonable doubt by the evidence in this case. And what happens here is that by the time we're done, the government has two theories which the jury is given. One is the false representations to applied employees. That's not in the indictment. It's an expansion of what's there. It is a gloss on what is there that is not supported and of which there is no notice. But in addition, and this, I think, is the one unavoidable problem in the case, in addition, sometime towards the end of the trial, a new theory arises, which is a theory of false concealment. It doesn't appear in the government's trial brief. It doesn't appear in the government's pretrial submitted instructions. It doesn't appear in the government's revised pretrial instructions. It's not argued or presented in the evidence. But when we get to the final jury instructions, we now are presented with a theory of false concealment that under Dowling requires one of two things, either a statutory duty or an existing fiduciary responsibility. There was no statutory duty here. The Trade Secrets Act didn't exist at the time. There is no other statutory obligation here to disclose. So the only possibility would be a fiduciary duty. A fiduciary duty, as you well know, and as Daisy and Dowling itself make clear, requires a position of power exercised by one party such that it has to accept with that position of power, of unequal power, a fiduciary responsibility to treat fairly and honestly. There was no such fiduciary duty here, certainly none expressed. And what happened was that rather than, not only did we have a new theory of fraudulent concealment, which the trial had not been about until the instructions phase, not only did we have a new theory, but we had a new theory on which the judge's instructions were simply wrong. What the Court told the jury in Instruction No. 24, which appears in our excerpt and I believe that's at page 38, Concealment of Material Fact, the Court says that the obligation to disclose can result from circumstances in which the judge's trust and confidence have been reasonably reposed by another. So what the Court has told the jury is that fiduciary duty, duty to disclose, can be unilaterally imposed by one party upon the other without knowledge, without agreement. On what grounds was that instruction objected to? I'm sorry? On what grounds was that instruction objected to? It was not objected to on these grounds. I believe that counsel did object to the instruction because they thought it was not factually supported. They did not. There was an objection clearly made that the evidence at the trial did not support this objection, and that is a correct statement. There is a problem of insufficiency here. But I believe that error in instructions can certainly, on a plain error basis, can be considered by this Court, even if the Court determines that the objection was not sufficient to preserve it. Well, I'm one. Let me just ask you this. I had a problem in reading the brief understanding whether you were contending that there was insufficient evidence for the crime. I don't seem to be – I couldn't see that. I saw the word there, but I couldn't see the argument made. I understand that, Your Honor. That the governance proof failed in some manner. Are you contending that in some manner that the government's proof failed? Your Honor, we do raise insufficiency. The evidence, we also recognize that – What matter? What element? In what way was the – There is simply no evidence of a fiduciary relationship. There is no evidence either – there is no evidence either of the kind of inequality between the parties that gives rise to a fiduciary duty, and no evidence of an agreement to accept fiduciary responsibility. The McDowells never signed a confidentiality agreement. And in fact, when 13 years after their relationship began, applied unilaterally gave them a confidentiality agreement that was retrospective 13 years and asked them to sign it, they said no. There was never an acceptance by the McDowell parties of any responsibility, fiduciary or confidentiality. And most of the – as we point out in our briefs, most of the early materials supplied by applied to the McDowell parties specifically said the materials were not confidential, were not – did not require confidential treatment. But there's another problem with the Court's instruction. Not only is there no evidentiary basis in the evidence to support it, not only is it a flat misstatement of the law that it allows one party to impose an obligation on another without that party's acceptance, but – and this is particularly significant in a case in which the defendant's entire problem, entire complaint was we don't know what we're charged with, we don't know what we're defending. The instruction that the Court gave was directly contrary to what the Court told the defendants when they understood the law to be in its June 4th, 2001 hearing. At page 163, and I know that it's not always advisable to read to a court, but I do think it's important to point out that at page – on June 4th of 2001, at the hearing on the motion to dismiss and for bill of particulars, what the Court tells the parties is that if Martin Lein knew that the documents were only to be used for X purpose, but that was never communicated to the defendants, even though that restriction existed, the defendants couldn't be responsible for doing anything wrong if they didn't know that the restriction existed. They have to know. That's what the Court told the parties, that it understood the law to be. That's the way the case proceeded. That's the way the trial went forward. Only at the end of the trial did the Court decide to give an instruction which was the exact opposite, which told the jury that it could convict, even if the defendants didn't know or agree, as long as applied reasonably reposed trust. That's a misstatement of the law and a complete prejudicial variance. And because – We have about two minutes left. Yes. And because the error on the fraudulent concedement ground was so clear, we have a Griffin problem. We have no idea what the jury used. So even if you're not troubled by the mail fraud, the Court has to be troubled by the fraudulent concealment instruction, and that, I think, undercuts the verdict. I would like to save the two minutes. We're here for the government. Thank you. Good morning. May it please the Court. I'm Barbara Valliere on behalf of the United States. I think the most important thing to point out to the Court is that the defendants never objected below to the language of the indictment. They never objected at least that the indictment did not allege a specific misrepresentation. There were objections, and there were bills in particular in which the parties discussed what it was the government's theory were prior to trial. And at the conclusion of the bill of particulars, the June 4th hearing that counsel referred to, the Court specifically outlined that the government's theory would be that either misrepresentations or false pretenses were made to applied materials by the McDowells when they obtained the documents, and that was either by false pretenses, by an affirmative statement, or by some type of concealment, and therefore that was the government's theory from there on out. It is true that the government indicted this case under a broad indictment. It mentions a scheme to defraud by, and I'd like to read the language of the indictment at paragraph 2A, that the defendants devised and executed a scheme to defraud applied materials through unauthorized diversion of applied materials, confidential business information in the form of semiconductor parts drawings. That is the key sentence, I think, in the indictment, which is that there was a broad language that there was a scheme to distort the confidential business information of applied materials to their own use, and subsumed within the language of unauthorized diversion, the Court concluded at the June 4th hearing was this notion that false pretenses had been used to obtain the documents. Given that theory, the government therefore went on at trial and presented a case in which, in a nutshell, summarized, I may summarize as that they obtained these drawings from applied materials employees, primarily from Martin Lean. They represented that the drawings would be used, or either affirmatively represented that the drawings would be used to make quotes back to applied materials, or that they did conceal the fact that they would, in fact, be using them. They concealed that they would be using them for another purpose. They thereafter erased from the drawings the logo and the name and the proprietary, all the proprietary information that applied to applied materials. They replaced it with their own name, McDowell and Company, and also a confidentiality stamp. They sent it out to vendors. They then received quotes and had parts made that were specialized parts that were the proprietary, that were based on proprietary information, applied materials. They then sold those parts to the customers of applied materials, all without the knowledge of the applied materials. That was the theory that was alleged in the indictment. And that is the facts that were presented at trial. Was there a prior relationship of McDowell making parts for? For applied materials? Yes. Yes, there was, Your Honor. There was a 20-year relationship, as the defendant testified to at length, between applied materials and McDowell, that McDowell made a certain set of materials. They made what they call O-rings or seals, which were not specified parts. The parts that were of concern and were listed in the indictment were, and the drawings that were used here that were converted to McDowell's use, were drawings that related to what they call specialized parts, parts that had to do with parts that were engineered specifically for applied materials machines. There was trade secrets or there was confidential business information that went into the making of those parts, and that's what made them so valuable. McDowell was not supplying those types of parts to applied materials, but they obtained, the evidence showed at trial and the allegations were, they obtained these particular drawings in the early 1990s from primarily Martin Lean in order to bid back to applied their capability of starting to supply those types of machine parts. Instead of doing that, and I think the record clearly shows at trial, McDowell and company never actually bid back to applied materials. Instead, they kept the drawings and they thereafter converted them repeatedly and for many years to their own use, despite the fact that the evidence at trial showed that they, in fact, had been told repeatedly either by applied materials employees or by one of the engineers that was involved in making these parts that they could not use these drawings in this manner. Despite that, they not only denied to applied materials during the course of this conduct that they were using the drawings in that manner and then continued to use them in that manner, but they also continued to replace the logos of applied materials and send them out. To whom did they make the representations that they were getting the drawings for the purpose of bidding? Your Honor, the record shows that they made representations to applied materials employees and that there is evidence that they made representations to Martin Lean. At least there is evidence from which the jury can conclude that that was so. And the evidence is that, first of all, Mr. McDowell had a meeting with the applied materials attorney in 1998 in which he sort of fessed up to his activity because they were fearful of losing their contract with applied materials. At that time, he represented in a letter and also orally that he had received the materials from Martin Lean and for the purposes of bidding. It was clear from his letter that that was the purpose that he had explained, at least to Martin Lean or the applied materials employees from whom he had received them. The court, pre-trial, had determined that the government could proceed under that theory, either affirmative misrepresentations, i.e., I'm going to use these documents for this purpose, or the theory that he's concealing his true motives in using the documents. And the reason that that was a viable theory in this case was because there was a purchase and sale agreement, a contract that was in existence between the two parties at the time. The purchase orders for machinery between Applied Materials and McDowell that was first signed in 1983, signed again in 1998, and again in 1992, which is perhaps the most relevant time, explained explicitly that there were proprietary, the proprietary information of Applied Materials was not to be disseminated without the written consent of Applied Materials. That's contained in, I think, the Court's reference in paragraph 23 and paragraph 28 of the documents of the purchase and sale agreements. There's no doubt that McDowell and Company signed those purchase and sale agreements when they entered into these contracts. Their defense at trial was that they were not supplying that type of material, but that did not mean that they were not bound. In other words, they were not, in fact, supplying these specific types of parts. Well, is there false representation in their denial that they were using it that way? Yes. Yes, there's a false representation at the time when they were asked whether or not they were using it this way by one of the Applied Materials employees that, in fact, that they were misusing them by converting them to their own use. Oh, I'm sorry. Go ahead. No, that's okay. So the false representation, one false representation is to say we want these materials for purposes of bidding. That's correct, Your Honor. Another one is a different false representation is to say we aren't using these for other purposes. That's correct, Your Honor. I mean, that's part of the fact that the indictment was charged, as I noted earlier, that it was unauthorized diversion of AMAC confidential business information. It was a continuing process. Many false representations were made to Applied Materials employees during the period of time. How long did this go on? Well, the indictment alleges 1994 to the year 2000. They obtained the documents, however, at least the record shows they may have obtained most of the documents prior to 1993. They started converting them, or at least the mail fraud counts were alleged in the indictment were in 1994. So they had had a series of years in which they had had possession of these particular drawings, been converting them to their own use, and then the specific overt acts and the specific mail fraud counts relate to specific mailings that occurred within, as counsel noted, the statute of limitations. What did the proof show that McDowell profited by? How much money did they make by doing this? Actually, the clearest proof of how much they profited by was the list of, that they supplied to Ann Dibble, the AMAT, the Applied Materials lawyer, during that 1998 meeting. They actually supplied a list saying we received these 73 drawings from Applied Materials and we profited approximately $940,000 by selling parts based on these drawings to other customers. Essentially what they did was they misappropriated the information, the drawings. They used the drawings as if they were their own, and then they cut Applied Materials sort of out of the loop, and that's how they profited. They made $940,000 based on their sale of those particular parts. That was the evidence of that. There was also some evidence admitted at trial of how much they were paid based on the specific mailings and the specific wire fraud counts for each of those individual parts that were ordered and delivered. Has there been related civil litigation to this? My understanding is that there was some discussion in the trial of civil litigation of a lawsuit that was brought. I don't know the – I honestly don't know the conclusion of that. But I'd like to address just briefly the second point that was made about the concealment instruction and just to clarify the record primarily that, again, I think the Court had pointed out that they never objected on the grounds they're claiming on appeal that the giving of the concealment instruction constructively amended the indictment because it added a new theory. It's our view, and the Court, I think, understood this during the June 4th hearing, that it didn't add any kind of new theory, that the theory always was that there were some false pretenses either by affirmative misrepresentation or by concealment of a material fact to Applied Materials that was the basis of the government's theory in this case. But with regard to the language of the indictment – I mean, excuse me, the language of the concealment instruction, they never objected to the language of the instruction either. They did object to the instruction being given on factual grounds, that there was no proof that there was a fiduciary duty between the two parties. But they never objected that the language of the instruction was somehow infirm. In fact, during the hearing on it, they suggested this language to the Court, that if the Court was going to be giving this particular instruction, it should give the following, and I can read it to you, it's at page 2621 of the transcript. If it is the government's burden of proof to you beyond a reasonable doubt that each of the defendants failed to disclose a material fact under a specific contractual duty to make a disclosure, or as required to make the disclosure because he is involved in circumstances where trust and confidence have reasonably been reposed by another in his integrity and fidelity. That's essentially the same language that the Court used when it instructed on the concealment instruction. Their only objection was there's no evidence of a fiduciary duty between or of a contractual duty, which is how actually they phrased it, between the two parties. As I mentioned earlier in my argument, there was evidence that they had signed a purchase and sale agreement with Applied on three different occasions, 1983, 1988, and 1992, in which the terms, whether or not specific, the terms of the contract were that they would treat Applied Materials' proprietary information as confidential. One other note is, of course, these Applied Materials drawings were stamped confidential. Each one of them were stamped confidential with this admonition that they should not be used without the written permission of Applied Materials. So there's no doubt that they were on notice the entire time that this was a misuse of the drawings. And one more thing with regard to whether or not there was sufficient evidence to give the instruction on concealment. It was Mr. McDowell himself at trial who testified about the relationship between McDowell and Applied Materials, that it had been a 20-year ongoing relationship. It was Mr. McDowell who testified that he was in a different place than other companies with Applied Materials because he had this ongoing relationship. I think they're hard-pressed not to say that that was sufficient evidence for the jury to conclude that there was some type of fiduciary duty on the part of McDowell to disclose this particular fact. The one thing I have not addressed. Do you need a disproportionate power relationship in order to hear that? That is raised by the defendant, Your Honor. And I don't think that you can read necessarily Dowling to create that obligation. However, if there is such an obligation, I think that it was met here primarily by the fact that Applied Materials did not manufacture these particular parts by themselves. They depended upon the distributors and the vendors to manufacture these parts. As one of the Applied Materials defendants testified, these particular parts were the heart and soul of Applied Materials. So in that respect, at least with regard to these drawings and these parts, it's clear that McDowell held a superior position to Applied Materials, or at least there was facts upon which the jury could conclude so. I'd like to address, if there are no further questions about the issues regarding the indictment and the proof at trial, just briefly the sentencing in this case. The briefs were all written at a time which was kind of confusing as to what the world is now about whether or not a remand is required. Mr. McDowell received a sentence that was sort of a combination of both an assessment of what the guidelines were about as well as departures, which the government originally had appealed as being improper departures under the guidelines. The landscape has changed dramatically since the briefing in this case, and I would suggest that if the court is, if the court think it necessary, that we can submit supplemental briefing on the sentencing issue. But I'd at least like the court to understand the government's position today. What the government's position is, is under Omeline 3, it's clear that the defendant did not object on the grounds that this was a pre-Blakely sentence and the defendant did not object on the grounds that he was, the court had found facts not found by the jury and therefore was relying on those facts for the sentence. I also think the defendant didn't object to that because, and this is perhaps key for our argument, the court actually didn't rely on what we would consider facts that would violate the Sixth Amendment requirement in Booker. If the court looks at the sentencing hearing as well as the court's explanation of its reasons for its finding on amount of loss, what it finds is the court relied on the defendant's admissions at trial. That's a key fact here. Because the court relied on the defendant's admissions at trial as opposed to making findings of fact on his own, that falls within, that does not violate Booker, and so there's no Sixth Amendment violation here with respect to the amount of loss. Because of that, this doesn't fall squarely within the court's reasoning in Omeline 3. In Omeline 3, the court reserved the question as to whether or not there needs to be a, quote, unquote, limited remand for the purposes of assessing the plain error standard if there's not a constitutional error. Here there is no, it's the government's position that based on the record there is no constitutional error, but there is, of course, the statutory error that the court did not understand that the guidelines were advisory. Applying the plain error standard, we do not think you need a limited remand in this context, and since this isn't addressed by Omeline, I just want to touch upon it briefly. The reason is because if you look at the sentencing hearing in this particular case, the court did almost everything that the defendant could have expected under Booker, which is the court talked about balancing the need for looking at the specific characteristics of the defendant versus balancing the specific need of punishment for this offense. Under the 3553 factors that have now been outlined by the Booker court, that's essentially all the defendant could expect. This is relevant because on a plain error standard, the defendant can't show essentially that his sentence in this case affected the fairness and integrity of the proceedings. For that reason, we would ask that the court affirm the sentence in this case without a limited remand. If the court is inclined to grant a limited remand under Omeline III, we would ask the opportunity to address it in writing. Thank you. Very quickly, Your Honor, three points. First, with respect to the sentencing, if the court would look at just one page of the record, page 48, the court will find that the defendant objected in writing to the loss calculation because the jury's verdicts only supported $92,000, objected to the leadership designation because the evidence didn't support it, and objected to more than minimal planning. Those three findings by the court without the jury amounted to ten levels. Without those findings, we start at a level 12. Clearly, under Booker-Fan-Fan, this has to go back for the court to redo the sentence if we get there. But if I may, two points with respect to the substance. Number one, the court's questions pinpointed exactly what the problem is here, and that is the drawings were obtained in 1991 and 1992. They were obtained from Martin Leon, and Martin Leon didn't testify. There was no evidence of a material misrepresentation to any employee or of applied material during the period of the indictment, during the period of the statute of limitations. There was no evidence that anything was obtained by false pretenses. Later, some people said that they believed that McDowell was misusing these items. But that the evidence was ambiguous on that. There was evidence that in the trade, marks were covered over all the time for legitimate purposes, and it was standard operating procedure. But the important thing is that the drawings were not obtained during the limitations period, and the whatever representations were made to get them were not during the indictment period or during the limitations period. With respect to the fraudulent concealment instruction, it's true that the defendant's objections below were not precise, but there's a rich irony here in the government defending an indictment on which a man and a company were convicted and seriously faced punishment, but the government defends it because it could mean a lot of different things, and the jury could find this, and the jury could find that, and yet the government would have the court refuse defendant review because his lawyers objected on this ground, not on that ground. I think it's the same thing. The case just argued is submitted for decision.
judges: Schroeder, Canby, Duffy